## HILLYARD v. MILLER.

Trusts for accumulation beyond the period allowed for the vesting of an executory limitation are absolutely void, although the fund thus to be created is directed to be ultimately applied to the foundation and support of a charity.

Where land is devised upon a trust which is void as tending to create a perpetuity, the heir is entitled to recover.

The subsequent grant by the legislature of a charter to execute such a trust, though in pursuance of the will of the testator, would not aid the devise or divest the estate of the heir: Per GIBSON, C. J.

IN error from the Common Pleas of Northampton.

*April* 26–7. This was an ejectment by the heir of Peter Miller, for a piece of land forming part of his residuary estate. The question was, whether the devise was void? The defendants were the tenant in possession, the executors of the devisor, and two incorporated religious societies, who were devisees in trust of the said residue. The will was dated Sept. 9th, 1846. The testator died in March, 1847. The testator bequeathed to "the contributors of the Female Benevolent Societies of the German Reformed and St. Johns' Lutheran congregations of the borough of Easton, and to their successors, the interest of $10,000 in trust, to be paid out of the income of my real and personal estate, half-yearly, and that the same shall be added to their capital, each one-half, and remain a part thereof for ever, for the purpose of assisting the poor widows and single women, the sick, the infirm, and the stranger, and the Sunday-schools, and poor children, without respect

to sect or denominations, as may be directed by the members of said institutions, and no loans made by the treasurer without their consent." The societies mentioned in this clause were incorpo· rated Sept. 10, 1846. After giving some directions immaterial to this case, the testator proceeded:—

"And whereas, I have been for a long while impressed with the importance of providing farmers of industrious and sober habits with farms, such, I mean, who have not the means to purchase for themselves, and have to depend on renting, though respectable, and that also of aiding and assisting with loans, such who having purchased or may purchase and find much inconvenience in borrowing from banks; and therefore having this object and the welfare of those in the adjacent townships in view, and also that of providing a suitable fund for the purposes herein mentioned, to be placed in some safe institution for the said purposes; and likewise, as it regards mechanics of good standing, of the borough aforesaid, who, in making purchases and improvements, may be likewise so circumstanced, and the amount of said loans, made safe with bond and mortgage, on good and productive farms, in the adjacent townships, and on good and productive real estate, made safe by insurance, situate in the borough aforesaid, and also for the payment of repairs and improvements, as herein directed. And having, as I have observed, this object and the welfare of all concerned in view, I do hereby give and bequeath all the residue of my estate, real and personal, whatsoever and wheresoever found, unto the corporations of the German Reformed and St. John's Lutheran congregations and churches, of the borough of Easton aforesaid (or by whatever name the same may be called or designated), and their successors in trust, and in the event or case that the said congregations and churches should not be incorporated, then, in that case, to the ministry and congregations of said churches, and their successors in trust, until the same shall be incorporated, and for the several purposes herein mentioned and declared, and for no other purpose, intent, or uses than what is herein mentioned and declared, and concerning the same, and so far as it regards my real estate, in trust, that no part thereof shall ever be sold or alienated, by the said or any other corporation, congregation, or ministry of said churches, their successors or others, but the same shall for ever thereafter be let, from time to time, to good tenants, at yearly or other rents, and upon leases in possession, not exceeding five years from the commencement thereof, and that the rents and issues or profits arising therefrom

shall be applied, after paying all demands against said estate, in keeping the same constantly in repair, and towards improving the same, whenever proper and necessary, by erecting new buildings, and the nett residue to be applied to the same purpose, as herein declared of and concerning the same; and so far as it regards my personal estate, in trust, to invest the same securely on bond and mortgage, on good and productive farms, in the townships adjacent and real estate as aforesaid, so that the income of said estate, with the interest, and that of the investments, &c., may form a suitable fund for the purposes herein mentioned and intended.; and I do hereby declare that none of the moneys, principal, interest, dividends, rents, &c., &c., arising from the said residue, devise, and bequests, shall at any time be applied to any other purpose or purposes whatsoever than those herein mentioned and appointed, and that all moneys received on account of said estate, shall be accounted for, and as from whom, by whom, when received, and as received, to be deposited in the Easton Bank, until loaned as herein directed, and just bills of accounts and demands against said estate being paid, the balance is to be loaned as aforesaid, deposits being made in the said Easton Bank, should the same be perfectly safe in so doing, and invested in loans, secured as before mentioned and directed; and I do hereby authorize, direct, and empower Samuel Wilhelm aforesaid, to receive and collect all moneys due, or to become due, on account of said estate, and after making a deposit or deposits of the same as received, to make such loans of the same, as hereinbefore mentioned and directed, and for which purpose or purposes he is to procure suitable books and assistance, and proper and correct accounts kept in the same, and also proper vouchers to be kept to correspond with the same, and to be produced for that purpose; and I do hereby further authorize the said Samuel, for the purpose of employing labourers, and in procuring suitable materials, and making contracts with mechanics, to make all proper and necessary improvements, by erecting new buildings, and repairing others, from time to time, and draw his checks for payments for the same, and for all just demands against said estate from said deposits, on bills, which are to be receipted and held as vouchers, for which purpose suitable books are to be procured, and a competent person to keep the same, with accounts of debit and credit, are to be correctly kept to agree with said bills and receipts and other vouchers, stating to whom paid, and for what purposes or services, and of all moneys received and paid, to whom, and from whom received, so that the

superintendence and transactions and matters concerning said estate may be fairly and plainly exhibited, each and every year, and the said Samuel is to receive two and a half per cent. for his services, and the amount necessary for a clerk and books. In the event, however, of the said Samuel's death, or his health or otherwise being prevented from attending to the business of said estate, even with assistance, then, in such case the said Samuel is hereby authorized to select and appoint a suitable person or persons to do and transact the business of said estate, as herein directed, in his place, so that the same be conducted and managed according and agreeable to the intent and meaning, and for the several purposes herein mentioned and declared; and such person or persons are hereby authorized so to do, by giving good and suitable security for their faithful and just performance of the same, and the trust imposed upon them; and further, in the event of the said Samuel being unwilling or unable to select and make choice of such person or persons as in his opinion would be suitable and capable, or otherwise deemed proper for the purposes aforesaid, and should prefer and determine to give up his trust and agency, that then, in the event of such determination, the corporation, ministry, and congregations as aforesaid, and their successors in trust, are hereby authorized and empowered to make choice of such suitable person or persons, that can give security for the amount wherewith they are intrusted, and their performance and management of their trust, according and agreeable to the intent and meaning, and the several purposes herein mentioned and declared; and that, under the superintendence of a committee appointed by the ministry of said congregations, a fair and satisfactory investigation shall be made at least once a year of the affairs and concerns of said estate, as before mentioned and directed. And further, should it so happen in the lapse of time, that the income of said estate-fund should accumulate beyond the application for such loans as may, and as hereinbefore mentioned, and concerning the same and likely to remain so, and the amount thus unemployed would safely justify the undertaking, and when mechanics and others may be in want of employment, and mainly for the accommodation, maintaining, and comfort of the poor respectable infirm widows and single women: it is further my will and desire, and I do hereby direct, that there shall be erected a building on the lot of ground I own on Bushkill street, facing the Bushkill creek, of brick, of large dimensions, and in neat modern style, as an asylum for the above purposes, and the costs of the same, with the support and comfort of the inmates, to be paid out

of the income of said income fund; also, for enclosing the same in front with a neat paling in front, and substantial fence on the alley and rear, and also, the lot I own east of said alley on said street, facing the Delaware, for the use of said asylum as a garden, and that the said Female Benevolent Societies and their successors shall have under their control the management and superintendence and direction of all the affairs and concerns said institution and asylum may acquire, and the means from said income fund to carry out and support the same, and for the further supervision and management of the same, there shall be a suitable person employed and books procured for the purpose of keeping an exact and correct account kept of expenditures and credits, with vouchers for the same, to be exhibited and investigated by the societies aforesaid, and to a committee appointed by them and said Samuel Wilhelm, and their successors, to have said books and accounts examined, and make report and a statement of the balance of the same and all the affairs of said trust, for the purpose or purposes of ascertaining the amount of said fund and the nett income or profits thereof, as a body politic or otherwise, as having the same in trust; and further, having had in contemplation of improving the lot I own on Ferry street, in said borough, I recommend and direct that there be erected on said lot or piece of ground a number of small brick buildings, to wit: two and two together, of fourteen feet each by thirty-two, leaving a space five feet for each, that is ten feet between each pair, as a sort of court-yard, except the two corner lots, which should be twenty feet front—the former being intended for respectable widows and single women in reduced circumstances, at low rents.

"And whereas I have certain estates in the state of New Jersey, it is my will and desire that the same be and is hereby to be placed on the same footing and condition in every respect as those in the state of Pennsylvania before mentioned; and whereas it may be proper and necessary that an act of incorporation should be passed to carry out the provision and intention of this will, I hereby direct that application shall forthwith be made by the trustees aforesaid or their successors in trust, or the executors herein mentioned, to the legislatures of the state of Pennsylvania and the state of New Jersey, to procure themselves incorporated under the title of Guardians of the Female Benevolent Society and Farmers' Friend, and to have perpetual succession, and the power to fill vacancies in their number of the election of the majority of the remaining members, so long as any vacancies shall occur, and

generally with such rights, powers, and privileges as may be deemed
necessary and proper to carry into effect the provisions of this will,
and for the faithful execution and right management of the trusts
hereby created or intended so to be invested in the said corpo-
ration and politic so to be created as aforesaid, and their successors
in trust shall thenceforth be the trustees under this my last will
and testament, and shall have the management of all the residue
of my estate, real and personal, so intended to be invested in the
said corporation as aforesaid, for the use and purposes and trusts,
subject, however, to the conditions and restrictions herein and
hereby declared and concerning the same.   It is further my will
and desire, as before stated, that books of accounts be accurately
kept, wherein everything relating to said trust shall fully and
distinctly appear, and all moneys received, from whom and upon
what account, shall therein be stated, and also, all payments and
disbursements shall be entered in said books, showing the amount
paid, to whom and for what purpose the same were paid, and all
vouchers shall be kept and preserved, so that the execution and
management of the trust may appear clearly and distinctly to the
said trustees, and to any other person or persons who may in any
way be entitled to inquire into or examine the same; and it is
further my will and desire to direct my said trustees, at the expi-
ration of each and every year after they shall be fully vested with
the rest and residue of my estate, real, personal, and mixed, as
aforesaid, to balance the books of said trust funds in such manner
as to exhibit a correct statement of the same, and of the income
of said trust, and the amount of the balance and clear profits
arising therefrom, after deducting all payments and necessary
expenses."

The two congregations mentioned in this clause were incorpo-
rated in 1807, by the Supreme Court.   The income of the real
and personal estate of the testator exceeded $4,000.   On a special
verdict finding these facts, the court, (JONES, P. J.) was of opinion
that the residuary devise was void, and accordingly gave judg-
ment for the plaintiff.

A. E. Brown and J. Sergeant, for plaintiffs in error, contended
that the bequest in the first clause of the will was undoubtedly
good, since it violated no rule of law whatever, and was but a
simple gift of $10,000 in charity, to two incorporated societies.
2. That the residuary devise was also valid.   The devisees, though
corporations, could take as trustees: 4 Wheat. 1; 3 Pet. 115; 1

Rep. 24; 1 W. 218; 17 S. & R. 88; and, though they might be incapable of taking the legal estate, yet the trust would not fail for want of a trustee: 1 Penna. 49. Charities are favoured, and this devise to erect an asylum for widows was a charity: 2 Stor. Eq. §§ 1165–67; 1 Jarm. on Wills, 513, n. 1; 2 Ves. Jr. 389; 3 Ib. 144.

Even if there was an objection on the score of accumulation, the devise was only void for the excess in the case of a charity: Cruise, Dig. Tit. 38, c. 20, § 58–9: and that this might be aided or modified by the legislature, 12 Mass. 544, as they also could aid the incapacity of the trustees: 7 J. C. R. 292; Amb. 422, 651; 3 Pet. 142; which action was contemplated by the testator: 1 Rep. 22, 25; and then the devise was good as an executory one: 3 Pet. 144. The devise for the asylum was so disconnected from the trusts for loans, as to be capable of separate execution; and it might consume the entire income. It need not, therefore, fail through the incapacity of the first object: 6 Mad. 32, 152; 2 Pow. on Dev. 21; 10 Ves. 22; 4 Bro. Ch. 394; 6 Taunt. 359; 2 B. & Al. 710; 4 Kent. 346; Fitz. 156; 2 Ves. 640; Cowp. 651; 7 Br. P. C. 111; 5 Paig. 318; 24 Wend. 641, 666. The devise, therefore, took effect as if the clause for accumulation were struck out: Lew. on Perpetuities, 594, 657–9; 2 V. & B. 54; 2 Swanst. 432; 1 Pow. on Dev. 406, n.; 4 Ves. 325; 12 Mass. 355; 1 P. Wm. 332; 2 Bro. Ch. 51; 2 Ves. Jr. 698; 2 Swanst. 45; Fearn. Ex. Dev. 314; 1 Wend. 395; 1 Jarm. 201, 252, 260, 276, 733; 2 Stor. Eq. 1167; 1 D. & Cl. 311; 1 W. & S. 205. At all events, since there are charges on the estate, the land did not descend; but remains in the trustees, for the accomplishment of those purposes: 1 Jarm. 200; 6 Taunt. 359.

*M. H. Jones* and *J. M. Porter*, contrà.—The question arises on the residuary devise. The first intent is to set apart a fund, which is to be perpetually loaned at interest, and on security. There is to be no expenditure of principal or interest, except for repairs, &c., until the contingencies occur: 1. Of an accumulation beyond the application for such loans; 2. Be likely to remain so; 3. The amount justify the undertaking; 4. Mechanics wanting employment. When these concur, the asylum may be erected. It is contended the purpose is indefinite, and tends to create a perpetuity, by preventing the alienation of the real estate, and continuing the ceaseless accumulation of the personalty. The ultimate charity is too remote and dependent on contingencies, and the whole

provision contrary to law : whence the devise fails, and the heir is entitled. The first and principal object is the creation of this loan-office. The minute and particular directions for its conduct, show it to be the great object of the testator. The trustees, moreover, are incompetent to take, for the income thus given them will exceed the limit established by the law. This trust is foreign to the objects of. the charters, and hence, also, the corporations are incompetent to take or hold : 9 W. 550 ; 2 W. C. C. R. 447 ; Rep. of the Judges on the Stat. of Mortmain. And if the trust itself be invalid, the devise is void : 2 Pow. on Dev. 13. The devise for the charity is too remote, for it is after contingencies already stated, which will probably never happen. It is also void for indefiniteness as to the objects, so that the court cannot see that the application is proper : 2 S. & St. 295 ; 1 Jarm. 316 ; 1 Shel. on Mortm. 85 ; 3 Meriv. 17. And if the fund given to the valid charity is to be ascertained, after the purposes of one which is invalid have been satisfied, the devise wholly fails : 6 Ves. 404 ; 9 Ib. 535 ; 2 V. & B. 297 ; 4 Wheat. 43 ; 1 Jarm. 321 ; Wm. Kely, 13 ; 2 D. & Cl. 74 ; 2 J. & W. 277. There can be no acceleration when the first devise is illegal : 1 Jarm. 513 ; 24 Pick. 146 ; 3 Dow. 194 ; 1 Swanst. 200. The means by which this charity is to be created, is equally objection-able. It creates a perpetuity, which is prohibited by the law : 1 Verm. 164 ; Lewis on Perp. 163 ; 1 Dr. & War. 245 ; 3 M. & K. 534 ; 9 Pet. 316. The ordinary rule against perpetuities was established by the discretion of the judges ; but this limitation transcends that rule : there are no lives on the determination of which the expenditure is to commence, and it is certain that it can-not in twenty-one years. That the limitation over is to a charity can make no difference, is shown from 1 Verm. 164 ; 2 P. Wm. 369 ; 3 M. & K. 534. And if the period must exceed twenty-one years, though there is no preceding limitation for life, it is equally void : 4 Russ. 403 ; 1 Jarm. 230 ; Lewis on Perp. 172. Precisely the same objections exist in the cases of charities, as to other aliena-tions in mortmain—the withdrawal of property from commerce. As to the first object—the loan-office—this, in no sense, can be called charitable. Its terms are the extreme legal interest and landed security.

GIBSON, C. J.—Trusts for accumulation of income, are as rigidly restricted by the rule against perpetuities, as legal estates. In the Duke of Norfolk v. Howard, 1 Vern. 164, Lord Keeper Guilford said, "all men are desirous to continue their estates in

their families; and if they could come nearer to a perpetuity in equity, than the rules of law would admit, they would settle their estates by way of trust, which might benefit the court, but would be destructive of the commonwealth." In subsequent cases, such trusts have been frequent subjects of litigation in equity. It was the indestructibility, not only of springing and shifting cases, and of executory devises, but also of future trusts, which forced upon the judges the rule against perpetuities, in order to set bounds to the remoteness of, not only legal, but equitable limitations; and it acts upon perpetuities wherever they appear, except in conveyances in mortmain, or to charitable uses. A perfect definition of a perpetuity has not been given, and the nearest approach to it is found in Lewis on Perpetuities, ch. 12, where it is said to be a future limitation, whether executory or by way of remainder, and of real or personal property; which is not to vest till after the expiration of, or which will not necessarily vest within the period prescribed by law, for the creation of future estates, and which is not destructible by the person, for the time being, entitled to the property subject to the future limitation, except with the concurrence of the person interested in the contingent event. If every perpetuity is a future limitation, the devise before us is not a perpetuity; for the limitation is immediate, and it vested, if at all, at the testator's death. But though, as it is said, trusts for accumulation have no immediate connexion with the doctrine of perpetuities, they may sometimes fall within the rule against them. The mischiefs of such trusts, when the limitations are immediate and absolute, are as great as when they are future and contingent; and that they are not suffered to last for ever, is shown by cases of trusts to accumulate a fund for the renewal of leases, which must be restricted to the prescribed period, either expressly or by reference to the time which the particular lease has to run. The same reason requires the suppression of a trust for endless accumulation, in an increasing ratio, by turning interest into principal, which would be a perpetuity of the worst kind. There must be a power in some person to put a stop to piling up capital from income, and to deal with the estate, in some reasonable time, as an unshackled one. No trust of this class can be allowed to last beyond the period for the vesting of an executory limitation; or even so long, if it be not then to vest in a person capable to convey it in fee, by deed, fine, or common recovery. A case near the point, is Grig v. Hopkins, Sid. 37, in which trustees of a term limited in tail, remainder in tail, were decreed to convey the estate over, because,

as a term cannot be entailed, there would have been a perpetuity in the trustees. Still nearer is Griffith *v.* Blunt, 4 Beav. 252, in which a trust to accumulate income for children, which was to vest in them at the age of twenty-five, was held to be void, because the vesting was too remote. But there is no need of an authority for a principle so evidently founded in wisdom and reason. What matters it, whether the testator limited the estate over, so as to retain it in his dying clutch, for a period longer than the law allows, for the vesting of an executory limitation; or, whether intending to clutch it for ever, he did not limit it over at all ? The mischief of indulging him would be the same, and the rule to restrain him must be the same. It might be supposed that the trust, if not sustainable in its extent, would be good for the time the law allows for the suspension of absolute power over the ownership; and certainly the decisions on the 39 and 40 G. 3, ch. 98, which narrowed the legal period for trusts of accumulation, have affirmed them for the statutory period, and disaffirmed them only for the excess—"a rule of construction," says Mr. Lewis, "entirely novel." And so indeed it was; for no transgressive trust was ever sustained, for any part of the common-law period. We have no such statute; and this trust, if transgressive, is void in the whole. And now for the application of the preceding principles to it, in the aspects in which it presents itself.

The testator directed a fund to be raised from the income of the estate, first, and principally, to accommodate farmers with loans for the purchase of land, and mechanics for the prosecution of their business; and, secondly, if the surplus income should allow it, to endow a hospital, for infirm widows and single women. The loan-office, as it has been aptly called, and the hospital, or asylum, as the testator calls it, would both perhaps be charities, within the statute of charitable uses; but, it follows not the first of them would be a charity here. Without stopping to discuss that point, take it for granted that it was a charity, for the sake of the argument. Now, a gift to a charity is not necessarily affected by the rule against perpetuities, as it is in the very nature of such a gift to withdraw the thing given from commerce and circulation, since alienation of it would be inconsistent with the use to which it had been dedicated; and therefore, it is, that a gift to an English charity is good, if it fall not within the prohibition of the 9 G. 2, ch. 36, which avoids gifts to charities that have not been made by deed, six months before the donor's death.

But a trust for perpetual accumulation of a part of the income,

though a consequence not intended, and though the founding of a charity were the exclusive motive, would be a perpetuity productive of all the evils which the law abhors; for it would ultimately draw into its vortex all the property in the state.   For proof of it, take the trust before us in connexion with the principal charity, so to speak, but disconnected from the other, which may never be called into active existence.   We would then have a gift of real and personal estate, in trust, to lend the income and increase the capital to infinitude by investing the interest of it, *toties quoties*, in other loans secured by bonds and mortgages, the produce falling into the general mass, and being applicable to all the primary uses of the trust.   It is easy to see what that would lead to.   As nothing would be disbursed except for agency and repairs, loans would be multiplied while farms remained to be bought, and mechanics to be assisted; for, so long as a propensity to run in debt is an instinct of our nature, borrowers would be found.   The consequence of this compounding of capital, would be the gradual absorption of nearly all the property in the country, which would thenceforth be locked up—a consequence more prejudicial to the general weal than that which followed the trusts in Mr. Thellusson's will, which produced little inconvenience except to the persons ultimately entitled, though they were left to expire by their own limitation.   The records of judicial decisions afford no case of a trust for perpetual accumulation without other aim—for no sane man would be so silly as to meditate such a thing; but when a trust is declared which is effectively such, though the object were ever so meritorious, ought it to be tolerated?   Testamentary charities, as already remarked, have been prohibited by the statute last quoted; the construction of which has been so far strained as to bring within its range many cases not within its letter or its spirit.   "Never," says Mr. Jarman, in his Treatise on Wills, vol. 1, p. 211, "was the spirit of any legislative enactment more vigorously and zealously seconded by the judicature, than the statute of the 9th of George the 2d."   The judges, says Mr. Lewis, gave it the widest possible scope, and have been astute to discover arguments for the application of it to cases seemingly *extra* the letter and the spirit of it.   This course of the English judges is a proof of the unmitigated evil of such trusts, in the mildest cases, and a legitimate encouragement to us to pursue it here, so far as we may consistently with precedent.   Had the statute not been enacted, there is little doubt that they would have put testamentary charities under wholesome restraints of their own

authority, at least so far as to deprive them of their most pernicious qualities. We mean not to say that trusts for perpetual accumulation would produce, in practice, the extreme consequence attributable to them in theory; for the inconvenience of them would be too insufferable to allow them to be carried out; but the contingent good of any charity attached to them would not compensate the actual evil attendant on them.

It is suggested that the disbursements for the hospital would return the income of the estate to the general mass of unfettered property. Out of the surplus proceeds of the income fund was to be built a hospital, or asylum, on one of the·testator's lots in Easton, for the comfortable maintenance of infirm widows and single women; and, on another, small dwellings for inmates of the same description, which were to be let to them, and the rents from which, it was supposed, would add to, rather than take from, the general income.

The first thing that strikes the mind, in regard to this, is, that the contingency which was to give practical existence to this secondary and subordinate charity, might never happen; and then a trust for indisputable accumulation would remain to go on for ever, founded on what is substantially a loan-office, in the garb of a charity, and essentially no more so than a bank is a charity. The second is, that, if it did happen, it would not be certain that the disbursements for it would keep down the general income.

The contingency specified was an accumulation of interest beyond the demands on it for further loans, under circumstances of apparent probability that it would, otherwise, remain unemployed for a time when mechanics would be without employment: in other words, if a time should arrive when the trustees could do no better with the surplus interest, they were to build a hospital with it; but not till then. Is it certain that the farmers and mechanics would cease to borrow while a dollar was to be lent? The affirmative rests on conjecture, which is not a basis for judicial determination. Besides, the time is referred to the unlimited discretion of the trustees, who might execute the testator's direction according to their notion of its expediency, or not at all. The records of this court show how reluctantly these obscure charities are administered. There was neither certainty nor probability that the hospital would be erected; and to sustain the trust it was necessary to be absolutely certain. The principle which requires it to be so is derived, by analogy, from future limitations, which, though the contingency on which they are to vest may possibly happen within the legal

period, are yet invalid if it may possibly not happen before the expiration of the period; an instance of which is found in Bacon *v.* Proctor, 1 Turn. & Russ. 31. It is very true, that the invalidity of a subsequent contingent limitation will not defeat a present absolute and valid one, as was held in Carver *v.* Bowles, 2 Russ. & Mylne, 307. But, disconnect the present trust from the future charity, and what have we? Certainly not a present valid limitation, but a naked and an invalid trust of indefinite continuance.

Moreover, it is not certain that the expenditure for the hospital would dispose of the entire income of the estate; nor did the testator suppose it would; for it certainly was not the principal object, as we see how anxiously he provided that it should not cripple the operations of the loan-office. Come what might, the lending was to go on. If a surplus were left, however small, that itself would be a nucleus, and, with its increments, a fund for perpetual accumulation. And it is highly probable, almost certain, there would actually be such a surplus. Only one building for the hospital was to be erected; and that done, the power to make the expenditure keep pace with the receipts would be spent. The outlay would be finite, the income infinite; and no power would be left to increase the one or decrease the other. But, for the reasons already given, it is enough for the judgment that it is not judicially certain there would be no surplus. Were it otherwise, a formidable perpetuity might be raised by tacking an insignificant charity to it.

To get over these objections, we have the testator's consent that a corporation be created to execute the trust, at the expense of public policy. The legislature has a constitutional right to change the law in its application to prospective cases; but, deriving its authority from the constitution, and not from individual consent, it is more than doubtful whether it could relax a rule of policy applicable to an estate already vested. The estate of the heir was divested at the testator's death, or it could not be divested at all. But no act of incorporation has been obtained, and the trust cannot be sustained upon the basis of anticipation. How long might it remain in abeyance, and yet be enforced? The legislature has not acted, and may refuse to act; in any event, a statute to confirm the devise would be disregarded. Even if it were viewed as a contingent limitation, depending on legislative action, it ought to be certain that the legislature would act within the legitimate period, else we might have a perpetuity for an indefinite time, dependent on expectation. On every ground, therefore, the heir was entitled to recover.                    Judgment affirmed.